**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES UNIT 1 OF THE WHITE SINGLE-FAMILY RESIDENCE LOCATED AT 485 GRANITE STREET IN MANCHESTER, NEW HAMPSHIRE | No. 21-mj- 283-01-AJ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Ryan S. Burke, depose and state as follows:

### AGENT BACKGROUND

1.        I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have

been so employed since October 2012. I am currently assigned to the FBI's New Hampshire Safe

Streets Gang Task Force ("SSGTF") where I am tasked with investigating gang members,

violent criminals, and major offenders throughout the state. As part of the SSGTF, I work

alongside law enforcement officers from various local, state, and federal agencies throughout the

state of New Hampshire.

2.        I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title

18, United States Code. I also am a "federal law enforcement officer" within the meaning of

Rule 41 of the Federal Rules of Criminal Procedure.

3.        Throughout my career, I have led and/or been involved with investigations of

robberies, kidnappings, murders, fugitives, extortions, threats, drug distribution, illegal

possession of firearms, and other crimes. My investigations have included the use of the

following investigative techniques: physical surveillance; handling of cooperating sources and

witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants.

4.      Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the violation of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances. For example, I have handled many cooperating sources and witnesses who have provided information to me specifically related to shootings, the distribution of controlled substances, and various firearms offenses. I have also reviewed thousands of court-authorized wiretap intercepts between drug traffickers, violators of firearm offenses, individuals conspiring to commit armed robberies, and individuals engaged in the violation of other offenses. Many of these investigations have resulted in the execution of search warrants, arrest warrants, and eventual convictions.

## **PURPOSE OF AFFIDAVIT**

5.      I submit this affidavit in support of an application for a warrant to search the following premises:

   a.      Unit 1 of the white residence located at 485 Granite Street in Manchester, New Hampshire (hereafter, the "**Target Premises**").

6.      Based on the information contained herein, there is probable cause to believe that **Target Premises**, described in Attachment A, contains evidence, fruits, and instrumentalities as further described in Attachment B of the crimes of 21 U.S.C. § 841(a)(1) [Possession with the Intent to Distribute and the Unlawful Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], 18 U.S.C. § 922(g)(3) [Possession of Firearm/Ammunition by an Unlawful User of Controlled Substances], 18 U.S.C. § 924(c)

2

[Possession of a Firearm in Furtherance of a Drug Trafficking Offense], and 18 U.S.C. § 521 [Criminal Street Gangs].

7.     The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## BACKGROUND INFORMATIONS

8.     In October 2021, law enforcement executed a state search warrant at a residence in Manchester, New Hampshire which led to the seizure of, amongst other things, approximately 200 grams of a substance which field-tested positive for cocaine. As a result, an individual (hereafter, "CW-1") was arrested and subsequently provided various information related to the commission of federal crimes. The interview was audio and video recorded. CW-1's criminal history includes convictions for misdemeanor Reckless Conduct and felonious Drug Distribution. Based on the detail of the information provided by CW-1, law enforcement's ability to validate portions of the information provided by CW-1, and my training and experience, I believe the information provided by CW-1 which I have detailed below is true and accurate.

## PROBABLE CAUSE

9.     In approximately April 2021, CW-1 became acquainted with an individual who CW-1 knows to live at the **Target Premises** known to CW-1 as "…Dex, Detorron Grice…" (hereafter, "Grice"). CW-1 stated Grice currently lives at the **Target Premises** with an individual who utilizes the moniker of "Miz" – the stepdad of "Dante" and "Jaden"; the boyfriend of "Crystal"; and the son of "Debbie." CW-1 further stated the family that lives at the

**Target Premises** flew Grice up to New Hampshire from Virginia because Grice had gotten into trouble in Virginia.

10.     Research by law enforcement corroborated each of the above facts provided by CW-1. Detorron Grice (YOB: 2001) does use the alias of "Dex" – confirmed by Grice when interacting with the Nashua Police Department on May 8, 2021. Grice is originally from Virginia as evidenced by a search of databases available to law enforcement which collate various public records and his criminal history. Moreover, according to his criminal history, on October 9, 2020, Grice was charged by the Newport News (VA) Police Department with felonious drug and firearm charges – recent trouble in Virginia. Furthermore, according to the Manchester Police Department ("MPD"), Michael Roux (YOB: 1981) (hereafter, "Roux") utilizes the moniker of "Miz" and lives at the **Target Premises** (a location where he was arrested on February 23, 2021 & the address he provided as his residence to MPD on June 1, 2021 during another incident). Roux also uses the address for the **Target Premises** – without a unit specified – on his New Hampshire driver's license. Additionally, Roux is/was the stepdad to Dante and Jaden Connor; there is a female named Crystal Lopez (hereafter, "Lopez") of similar age to Roux with a vehicle registered to the **Target Premises**; and Roux appears to be the son of Deborah "Debbie" Roux (hereafter, "Deborah"), according the law enforcement databases.

11.     CW-1 believes Grice is affiliated with a criminal street gang from Virginia. Grice acknowledged to CW-1 that he has friction with a local group of individuals that claim to be a subset of the Bloods criminal street gang. CW-1 believes Grice has committed acts of violence against local street gang members[1]. Furthermore, in late summer 2021, Grice informed CW-1

---

[1] Manchester Police Department reports also contain information wherein Grice is suspected in various gang-related activity.

that he previously shot and killed someone in Manchester in retaliation for a disagreement the victim had with a former occupant of the **Target Premises**.

12.     During an unspecified time between April 2021 and late summer 2021, CW-1 was inside the **Target Premises** and observed a pistol inside Grice's bedroom, which Grice was not sharing with anyone else at the time. CW-1 described the pistol as large, likely .45 caliber, and rusted. In early October 2021, Grice met with CW-1 at a place outside of the **Target Premises** while carrying the same pistol observed previously by CW-1. Because of this, I believe Grice is still in possession of the firearm.

13.     In approximately mid-October 2021, Grice informed CW-1 that Roux was a distributor of cocaine and that Roux wanted to meet with CW-1. A few days later, CW-1 met with Roux inside the **Target Premises** and Roux fronted CW-1 a "half brick" of cocaine. CW-1 confirmed the approximately 200 grams of cocaine seized from CW-1 by law enforcement was a portion of the half brick CW-1 received from Roux. CW-1 observed numerous, stamped bricks of cocaine inside the **Target Premises**. Roux informed CW-1 the price for the half brick would be $15,000 at a rate of $30 per gram (suggesting the half brick was equal to 500 grams).

14.     To CW-1's knowledge, Roux rarely leaves the **Target Premises** to conduct narcotics transactions. However, CW-1 has observed Roux driving a dark colored BMW vehicle which has been parked at the **Target Premises**. CW-1 believes Roux has Grice conduct smaller narcotics transactions on Roux's behalf, which is consistent with Grice soliciting a partnership with CW-1 in their conspiracy to distribute cocaine. CW-1 has observed Grice drive a Lexus vehicle which has been parked at the **Target Premises**. CW-1 stated that Roux recently solicited information related to suppliers of methamphetamine. In addition to Grice assisting Roux with the distribution of cocaine, CW-1 is aware that Grice also sells marijuana.

15.     A review of information maintained by the City of Manchester Assessor's Department confirmed the **Target Premises** is owned by "Roux, Deborah R" – believed to be the mother of Roux. The assessor information describes the property as "Two Family" and lists Deborah as the sole owner of the property. In various MPD reports, as referenced above, Roux provided the **Target Premises** as his residence. Conversely, Deborah has provided Unit 2 of the same address to MPD as her residence. Furthermore, officers with New Hampshire Probation and Parole ("NHPP") confirmed that Deborah and Roux's juvenile daughter (for which Deborah is the legal guardian) live in Unit 2 while Roux, Lopez, and possibly others live in the **Target Premises**. NHPP also confirmed the **Target Premises** is accessed by the southeastern-most door of the structure, as detailed on the right-side photograph on Attachment A. It is also believed by NHPP that the **Target Premises** also has direct access to the attached barn in the rear of the structure.

16.     For the reasons listed above, I believe probable cause exists that the **Target Premises** will contain evidence, fruits, and instrumentalities of the crimes of 21 U.S.C. § 841 [Possession with the Intent to Distribute and the Unlawful Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], 18 U.S.C. § 922(g)(3) [Possession of Firearm/Ammunition by an Unlawful User of Controlled Substances], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], and 18 U.S.C. § 521 [Criminal Street Gangs].

### TRAINING AND EXPERIENCE – DRUGS AND FIREARMS

17.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and law enforcement officers, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes,

automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency. Based on my training and experience, powder drugs such as fentanyl and cocaine are generally brought into the region in bulk. However, such drugs are not typically consumed by users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level. High purity powder drugs are reduced in purity by the addition of dilutants. This process is called "cutting" or "stepping on" the drug. Other equipment, such as scales, presses, grinders, razor blades, glass panes, blenders, and mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a usual practice is to repackage or "press" it in smaller quantities such as ten (10) gram fingers or other types of plastic bags for redistribution.

18.     It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

19.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature

(e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

20.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

21.     It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money

orders to pay for controlled substances. They may also use banks and wire companies, both

foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping

companies and keep records of shipments of goods bought with drug proceeds. Records relating

to income and expenditures of money and wealth in connection with drug trafficking would also

typically be maintained in residences. I know that drug traffickers sometimes purchase real estate

with suspected drug proceeds. They may keep records of real estate transactions, money received

from rental properties, and other such documents in their residences.

22.     Based on my training and experience, I know that individuals involved in the

distribution of controlled substances attempt to hide the true identity of their residence and,

further, employ methods of surveillance at such residence in order to evade law enforcement.

Typically, these individuals will maintain at their residence documents relating to the identity of

the person(s) in residence, occupancy, control, or ownership of the subject premises. Such

identification evidence is typical of the articles people commonly maintain in their residences,

such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books,

diaries, utility and telephone bills, statements, identification documents, and keys. I know that

drug traffickers often use storage units to store drug proceeds and that keys or records of these

units may be kept in residences.

23.     Often, drug traffickers possess firearms and other dangerous weapons to protect

their profits, supply of drugs, and persons from others who might attempt to forcibly take the

traffickers' profits and/or supply of drugs. Additionally, members of criminal street gangs

engaged in the distribution of drugs and other gang-related activity often possess and maintain

firearms to protect themselves from rival gang members. Based on my training and experience, I

know drug traffickers and criminal street gang members typically store firearms and ammunition

inside their residences and vehicles. These are common storage areas because drug traffickers and criminal street gang members must have the firearm(s) and ammunition in their immediate proximity because of the uncertainty of when they may need to protect themselves from assailants.

24.    I also know, based on my training and experience, that drug traffickers and criminal street gang members are less likely to dispose of firearms which are ideal for use in the commission of crimes (i.e. without a paper trail connecting the drug trafficker / gang member to the firearm). Moreover, firearms are oftentimes acquired by drug traffickers and criminal street gang members as personal possessions rather than items acquired solely for the purpose of reselling for a profit (such as controlled substances). For these reasons, I believe firearms are likely to be kept for longer periods of time by drug traffickers and criminal street gang members than other types of contraband.

25.    Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

26.    Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

27.    It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

28.    I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

## TRAINING AND EXPERIENCE – DIGITAL DEVICES

29.    In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

30.    As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed

from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

31.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

32.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not

always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now

commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was

14

downloaded or viewed than on a particular user's operating system, storage

capacity, and computer habits. Recovery of residue of electronic files from a

hard drive requires specialized tools and a controlled laboratory

environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in

the form of user-generated documents (such as word processing, picture,

and movie files), digital devices can contain other forms of electronic

evidence as well. In particular, records of how a digital device has been

used, what it has been used for, who has used it, and who has been

responsible for creating or maintaining records, documents, programs,

applications and materials contained on the digital devices are, as described

further in the attachments, called for by this warrant. Those records will not

always be found in digital data that is neatly segregable from the hard drive

image as a whole. Digital data on the hard drive not currently associated

with any file can provide evidence of a file that was once on the hard drive

but has since been deleted or edited, or of a deleted portion of a file (such as

a paragraph that has been deleted from a word processing file). Virtual

memory paging systems can leave digital data on the hard drive that show

what tasks and processes on the computer were recently used. Web

browsers, e-mail programs, and chat programs often store configuration data

on the hard drive that can reveal information such as online nicknames and

passwords. Operating systems can record additional data, such as the

attachment of peripherals, the attachment of USB flash storage devices, and

the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

33.  Based on my training and experience, I believe that it is likely that the **Target Premises** will contain smartphones that can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some

16

models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

34.     If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

35.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

36.     Although Apple's Touch ID may be the most common or well-known means for unlocking a device with a fingerprint, I am aware that other brands of smartphones like Samsung

17

also offer a similar feature that works essentially the same way. Therefore, when I refer to
"Touch ID" I am not just referring to Apple devices, but to similar technology on all
smartphones. While I believe that the targets of this investigation likely use smartphones, I am
not aware of the particular brand of phone that they use.

37.    The passcodes that would unlock the targets' devices is not known to law
enforcement. Thus, it may be necessary to press the fingers of the user of the device to the
device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the
search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints
of the user is necessary because the government may not otherwise be able to access the data
contained on those devices for the purpose of executing the search authorized by this warrant.

38.    Based on the facts discussed in this affidavit I believe that Roux and Grice likely
use cellular phones to facilitate the commission of the aforementioned offenses and thus their
fingerprints are among those that would be necessary to unlock their devices via Touch ID.

## AUTHORIZATION TO COLLECT DNA SAMPLES

39.    Because the **Target Premises** may be occupied by numerous individuals, I
respectfully request authorization to obtain DNA (Deoxyribonucleic acid) samples from Roux
and Grice. The DNA samples would be used for comparative analyses of any firearms,
ammunition, or other items seized from the **Target Premises**, and any other relevant items
collected during the course of this investigation. The request to collect DNA samples from Roux

and Grice is subject to their presence at the **Target Premises** during the execution of the requested warrant.

## CONCLUSION

40.     For all the reasons described above, I submit that there is probable cause to believe that evidence, instrumentalities, and fruits of the violations of 21 U.S.C. § 841 [Possession with the Intent to Distribute and the Unlawful Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], 18 U.S.C. § 922(g)(3) [Possession of Firearm/Ammunition by an Unlawful User of Controlled Substances], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], and 18 U.S.C. § 521 [Criminal Street Gangs], further described in Attachment B, will be found by searching the **Target Premises** described in Attachment A.

## REQUEST FOR SEALING

41.     I request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public and/or known to all parties relevant to the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

/s/ Ryan S. Burke
Ryan S. Burke, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:  Nov 3, 2021
Time:  9:24 AM, Nov 3, 2021          HONORABLE ANDREA K. JOHNSTONE
                                     UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be Searched*

Unit 1 of the white residence located at 485 Granite Street in Manchester, New Hampshire (hereafter, the "Target Premises").

The Target Premises to be searched includes the main residence and all attached and unattached rooms, attics, basements, garages and storage areas, floor, wall and combination safes, lockers, briefcases, containers, trash areas, and outbuildings assigned to or part of the particular apartment; surrounding grounds and common areas/staircases; as well as the persons of adults located at the premises at the time of the execution of this search warrant. The premises to be searched further includes vehicles which are present on the curtilage of the property.

 

## ATTACHMENT B

*Items to be Seized*

1.          All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841 [Possession with the Intent to Distribute and the Unlawful Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], 18 U.S.C. § 922(g)(3) [Possession of Firearm/Ammunition by an Unlawful User of Controlled Substances], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], and 18 U.S.C. § 521 [Criminal Street Gangs] by Michael Roux, Detorron Grice, and any co-conspirators, including information and items related to:

   a.   Firearms, weapons, ammunition, and firearms-related accessories;

   b.   DNA sample(s) from Roux and Grice;

   c.   Controlled substances and materials consistent with controlled substances packaging;

   d.   Criminal street gang affiliation and criminal street gang activity, such as acts of violence and other criminal activity in furtherance of the criminal street gang or conducted by its members;

   e.   United States currency, foreign currencies, and other forms of currency acquired or used during transactions involving contraband;

   f.   Places and locations where evidence of the above-referenced criminal offenses was obtained or discarded, or is currently stored;

   g.   The identities of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the offenses enumerated in this application;

   h.   Electronic devices, including mobile electronic equipment, serial numbers or any electronic identifiers that serve to identify the equipment, and the information stored electronically on the devices, specifically:

      i.      telephone logs, contact lists, other records reflecting names, aliases, addresses, telephone numbers, and other contact or identification data;

      ii.     the actual and attempted possession, purchase, receipt, sale, pawn, trade, transfer, transportation, shipment, or other disposition of controlled

substances, including buyer lists, seller lists, notes, pay-owe sheets, records of sales, logs, receipts, and communications;

iii.    the actual and attempted possession, purchase, receipt, sale, pawn, trade, transfer, transportation, shipment, or other disposition of firearms and ammunition, including buyer lists, seller lists, notes, pay-owe sheets, records of sales, logs, receipts, and communications;

iv.    criminal street gang affiliation and criminal street gang activity, such as acts of violence and other criminal activity in furtherance of the criminal street gang or conducted by its members;

v.    messages and other communications related to controlled substances, firearms violations, and criminal street gang affiliation and activity;

vi.    photographs, images, and depictions of controlled substances, firearms, criminal street gang affiliation and activity, and currency;

vii.    who used, owned or controlled the equipment;

viii.    when the equipment was used;

ix.    the travel and whereabouts of the user of the equipment;

x.    the attachment of other hardware or storage media;

xi.    the use of counter-forensic programs and associated data that are designed to eliminate data;

xii.    passwords, encryption keys, and other access devices that may be necessary to use the equipment; and

xiii.    accounts associated with software services or services providing Internet access or remote storage of either data or storage media

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    Items described in Paragraph 1(a) through (i);

b.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d. evidence of the lack of such malicious software;

e. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f. evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

g. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i. evidence of the times the COMPUTER was used;

j. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l. records of or information about Internet Protocol addresses used by the COMPUTER;

m. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,

or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the property described in Attachment A, law enforcement officers are authorized to press or swipe the fingers (including thumbs) of any individual, who is found at the subject Target Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.